S.H. BENNION, Plaintiff and Appellant,

v.

UTAH STATE BOARD OF OIL, GAS & MINING and Shell Oil Company, a Delaware corporation, Defendants and Respondents.

No. 18345.

Supreme Court of Utah.

Nov. 4, 1983.

Peter Stirba, Salt Lake City, for plaintiff and appellant.

Alan L. Sullivan, Salt Lake City, for Shell Oil.

David L. Wilkinson, Atty. Gen., Richard L. Dewsnup, Asst. Atty. Gen., Salt Lake City, for defendants and respondents.

OAKS, Justice:

This is a case of first impression on the rights of a nonconsenting mineral owner under the pooling provisions of the Oil & Gas Conservation Act, U.C.A., 1953, § 40–6–1, *et seq.* After extensive hearings, the Board of Oil, Gas and Mining ("the Board") ruled for the operator, Shell Oil Co. The mineral owner, Bennion, challenged that order in an action or appeal (the authorizing statute uses both terms, § 40–6–10) in the district court. On cross-motions for summary judgment, the district court affirmed the Board's order, and the mineral owner pursued this appeal. The issues all concern the rights of the owner of a mineral interest who refuses to enter into a voluntary pooling arrangement with the operator of a drilling unit as to the period prior to the effective date of an order forcing the pooling of all interests in the drilling unit.

We note at the outset that while this appeal was pending the Legislature repealed Title 40, chapter 6, and reenacted it with different content and section numbers. Utah Laws, 1983, ch. 205. Neither of the parties has suggested that any of these changes affect the resolution of this controversy. Statutory references herein are to the legislation in force at various times pertinent to this controversy and prior to the reenactment in 1983.

Under the common law "rule of capture," a property owner could drill a well on his own land and recover oil or gas by drainage from his neighbor. *Brown v. Spilman*, 155 U.S. 665, 670, 15 S.Ct. 245, 247, 39 L.Ed. 304 (1895); 1 Williams & Meyers, *Oil & Gas Law* § 204.4 (1981). This rule of law produced results that were unfair to many landowners and development practices that were uneconomical or wasteful for all. Thus, it encouraged the drilling of more wells than necessary to drain a field, and it permitted techniques and rates of production that augmented the profits of the property owner whose land was producing, but wasted the resources of the field as a whole. Allen, "An Argument for Enforced Unit Development of Oil and Gas Reservoirs in Utah," 7 *Utah L.Rev.* 197 (1960). Legislative remedies were required.

The Utah Oil and Gas Conservation Act, enacted in 1955, implements the declared public interest in developing natural resources in a manner that will prevent waste, foster greater ultimate recovery, and protect the correlative rights of all property owners. § 40–6–1. The Act establishes the Board of Oil, Gas and Mining (as it is now known) and gives that body broad powers of policy making and adjudication to enforce the provisions of the Act. Those powers include identifying ownership of oil or gas wells and producing leases and specifying and supervising techniques of exploration and production. § 40–6–5. Other powers are mentioned below. The constitutionality of this legislation is not at issue on this appeal. (Similar legislation in other states has been upheld. Authorities cited Annot. 37 A.L.R.2d 434 (1954)).

## I. FACTS

In 1971 and 1972, in the exercise of its statutory powers, § 40–6–6, the Board established oil and gas drilling units for large areas in the state. The Board made each "section" a drilling unit and authorized the drilling of only one well on each unit. Among the units so established was Section 1, Township 2 South, Range 5 West, Uintah Special Meridian, in Duchesne County. At about this time, the working interests in the minerals in this section were owned by or leased to eight persons. Shell Oil Co. had a little over 75 percent of the total mineral interests in the section, and Bennion owned about 3 percent (an unleased one-fourth mineral interest in 80 acres). (The royalty interests under leases, held by approximately fifty other persons, are not at issue here.)

In June 1973, Shell notified the other seven working interest owners of its intent to drill a well in the unit and proposed that their interests be pooled by agreement, as authorized in § 40–6–6(f). All agreed except Bennion, who notified Shell by letter in December 1973 that he did not want to be involved in the venture. Shell proceeded with the well and completed it as a producer on July 7, 1974. Production (or proceeds) and costs were divided among the various working interest owners in accordance with their agreement. As a "nonconsenting owner," Bennion's rights and duties were as prescribed by the statutory law, Utah Laws, 1966, ch. 8, § 1, § 40–6–6(g) (prior to amendment in 1977), whose uncertainty provides the occasion for this appeal. At this point, Bennion apparently believed the statutes guaranteed him a roy-

alty on his interest, free from any share of the costs of drilling, and Shell apparently believed that Bennion had no rights to any payment so long as he was not involved in any pooling arrangement.

In February 1975, Bennion petitioned the Board to exercise its statutory power, § 40–6–6(f), to order the pooling of all interests in the drilling unit (so-called "forced pooling"). Hearings scheduled for March and September 1975 were continued without date upon Bennion's request.

Correspondence exchanged between Bennion and Shell during the fall of 1975 illuminates the nature of their controversy. Bennion contended that his share of the total mineral interest in the section was 3.125 percent; Shell maintained it was 2.94898 percent. The difference concerned the size of the section. Bennion calculated his share on the basis of a drilling unit of 640 acres, relying on the fact that the Board order establishing drilling units in this area specified "640 acre drilling units ... comprising each governmental section, or governmental lots corresponding thereto...." (Cause No. 139–8, Order of Sept. 20, 1972.) Shell calculated on the basis that Section 1 in fact contained 678.2 acres rather than the usual 640.

In order to reap maximum benefits from his position as the owner of a mineral interest in a producing well, Bennion had to enter a pooling arrangement and pay his share of the producing costs along with the other owners of the working interests. In December 1975, he sent Shell a check for $26,293.87 for that purpose. He calculated this amount on the basis of Shell's report of total costs of $841,403.82 through February 1975 and his claimed share of 3.125 percent. Shell promptly returned the check with a letter explaining that "we do not agree with the facts and conditions presented therein," an obvious reference to the continuing controversy over the exact size of Bennion's interest.

In May 1976, the well achieved "payout"; i.e., the value of its production exceeded the amount necessary to pay drilling and related costs. Before and after that time, Shell and Bennion continued to negotiate sporadically. Neither sought further intervention from the Board until June 7, 1979, when Bennion renewed his petition for forced pooling. After several hearings, the Board, in an interim order entered March 26, 1980, ordered the drilling unit pooled, effective July 26, 1979. The final order, entered April 30, 1981, reaffirmed the forced pooling, recognized the 678.2 acres of Section 1 as the drilling unit, established Bennion's interest in the unit at 2.94898 percent, and directed that Bennion was entitled to his share of production *in kind* from and after the date of the forced pooling, upon payment of his share of expenses.

As to production prior to the forced pooling, the Board's order stated "that Shell is willing to let Bennion share in the proceeds of production of said unit from first production," thus sidestepping the contested issue of the nonconsenting landowner's vested right to a share of production prior to pooling. In defining Bennion's right to these "proceeds" of production, the Board ordered, in substance, as follows. (These orders were affirmed by the district court, and their result or reasoning is to greater or lesser extent challenged on this appeal.)

1. A nonconsenting mineral owner is entitled to his proportionate share of a one-eighth royalty from first production to payout, thus treating him during this period as if he had leased his mineral interest to the operators for the standard royalty. (In Bennion's case, this amount totalled $14,-334.48.)

2. From payout to the effective date of pooling, a nonconsenting mineral owner is entitled to his proportionate share of the revenue received from production, less his proportionate share of expenses, including expenses incurred prior to payout as well as thereafter. (In Bennion's case, this amount totalled $105,-091.09 less $47,203.16, which equalled $57,887.93. This amount plus the royalty of $14,334.48, a total of

$72,222.41, had been paid by Shell and invested in a money market certificate immediately after the interim order of March 1980. The Board ordered this certificate and accrued interest delivered to Bennion.)

3. Shell was required to pay Bennion 6 percent interest on the amount of his "statutory royalty" for the period from first production until the purchase of the original money market certificate. (This amount was calculated at $2,504.)

In respect to these orders, Bennion contends (1) that he should receive production in kind prior to the pooling order. In the alternative, if Shell is held to be able to satisfy its obligation by cash payments for the proceeds of production, Bennion contends (2) that his royalty should be "cost free," so Shell must not deduct expenses incurred prior to payout, and (3) that he is entitled to interest on amounts due under his working interest payments (after payout), as well as his royalty payments.

## II. SCOPE OF REVIEW

The parties differ on the scope of judicial review of the decisions of the Board. The governing statutory provision, which stands just as it was originally enacted in 1955, is ambiguous in its reference to at least three different standards of review. It authorizes the district court to block or set aside an order of the Board,

[I]f the plaintiff shall show that as to him the act or conduct complained of is unreasonable, unjust, arbitrary or capricious, or violates any constitutional right of the plaintiff, or if the plaintiff shows that the act complained of does not constitute or result in waste, or does not in a reasonable manner accomplish an end that is the subject matter of this act.

§ 40–6–10(b).

This undifferentiated statutory reference to the separate standards of (1) error of law, (2) reasonableness, and (3) arbitrary or capricious action is readily clarified simply by designating the three types of administrative actions to which these three differ-

ent standards apply. We did this in *Department of Administrative Services v. Public Service Commission*, Utah, 658 P.2d 601, 607–12 (1983). We hold that the rules of that case are applicable to district court review of the decisions of the Board pursuant to § 40–6–10(b).

■ Since the Board decisions sought to be reviewed in this case are all interpretations of the operative provisions of the law the Board is empowered to administer or instances of Board application of rules of law to uncontested basic facts, the only standard of judicial review that needs to be applied in this case is whether the administrative action "fall[s] within the limits of reasonableness or rationality." *Id.* at 610. That is the standard the district court should apply in reviewing the Board's decisions on matters such as this.

But what standard should this Court apply in reviewing the district court's judgment in this case? That is a question not discussed in *Department of Administrative Services*, since our jurisdiction in that case involved our direct review of the administrative agency, without an intervening judgment by the district court.

■ By the weight of authority, when a lower court has reviewed an administrative decision and that court's judgment is challenged on appeal, the appellate court reviews the administrative decision just as if the appeal had come directly from the agency. In this circumstance, the appellate court gives no presumption of correctness to the intervening court decision, since the lower court's review of the administrative record is not more advantaged than the appellate court's review. *Alabama Public Service Commission v. Nunis*, 252 Ala. 30, 34, 39 So.2d 409, 412 (1949); *Kelly v. Kansas City*, 231 Kan. 751, 754, 648 P.2d 225, 229 (1982); *Urban Council on Mobility v. Minnesota Department of Natural Resources*, Minn., 289 N.W.2d 729, 732–33 (1980); *Gourley v. Board of Trustees of South Dakota Retirement System*, S.D., 289 N.W.2d 251, 253 (1980); *Wyoming State Department of Education v. Bar-*

*ber,* Wyo., 649 P.2d 681, 689 (1982). *Accord, Merrill v. Department of Motor Vehicles,* 71 Cal.2d 907, 458 P.2d 33, 38, 80 Cal.Rptr. 89, 94 (1969); *Smith v. O'Keefe,* 9 Ill.App.3d 814, 293 N.E.2d 142 (1973); *Cook v. Iowa Department of Job Service,* Iowa, 299 N.W.2d 698, 701 (1980); *Seidenberg v. New Mexico Board of Medical Examiners,* 80 N.M. 135, 137, 452 P.2d 469, 471 (1969); *City of North Las Vegas v. Public Service Commission,* 83 Nev. 278, 281, 429 P.2d 66, 68 (1967); *Norway Hill Preservation & Protection Association v. King County Council,* 87 Wash.2d 267, 276, 552 P.2d 674, 679 (1976). We adopt that rule.

▮ The foregoing rule has the virtues of clarity and ease of application, but it fosters a duplication of judicial review that is inconsistent with the effective use of scarce judicial resources. Consequently, a minority position affords some deference to the reviewing judgment of the lower court. *E.g., Arizona State Board of Medical Examiners v. Clark,* 97 Ariz. 205, 210–11, 398 P.2d 908, 912–13 (1965); *Allstate Mortgage Corp. of Florida v. City of Miami Beach,* Fla.App., 308 So.2d 629, 631 (1975), *overruled on other grounds, Nance v. Indialantic,* Fla., 419 So.2d 1041 (1982). Legislative bodies may also restrict an appellate court's scope of review in such circumstances. *E.g., Universal Camera Corp. v. National Labor Relations Board,* 340 U.S. 474, 490–91, 71 S.Ct. 456, 465–66, 95 L.Ed. 456 (1951).[1]

▮ There being no legislative modification of the general rule in this circumstance, we hold that at least as to the kind of questions reviewed in this appeal we will review the administrative record and apply the reasonableness test just as if the appeal had come directly from the Board to this Court.

---

1. The above discussion only concerns the circumstance where the lower court review is in the nature of an appeal. The appellate court clearly exercises the traditional (diminished) appellate scope of review when the lower court has received new evidence in a trial de novo, *Arizona Corp. Comm'n v. Reliable Transp. Co.,*

## III. ISSUES ON APPEAL

### A. Board Orders for the Payment of Money

At the outset, we confront the Board's power to issue an order for the payment of money. Since this is a case of first impression on the application of the Oil and Gas Conservation Act, we feel obliged to discuss this issue, even though it has not been argued by the parties. If this power is lacking, the issues raised by the parties are all moot.

Section 40–6–3.3(1) of the Act provides as follows:

> The board shall have and is hereby given jurisdiction and authority over all persons and property, public and private, necessary to enforce the provisions of this act and shall have the power and authority to make and enforce rules, regulations and orders and do whatever may reasonably be necessary to carry out the provisions of this act.... Any person ... may apply for a hearing before the board, or the board may initiate proceedings upon any question relating to the administration of this act, and jurisdiction is hereby conferred upon the board to hear and determine the same and enter its rule, regulation or order with respect thereto.

▮ As noted earlier, the Board is explicitly authorized to establish drilling units, § 40–6–6(a), to limit the number of wells to be drilled thereon, § 40–6–6(b), and, by pooling order, to determine the interest of each owner and to resolve disputes over the amount of costs allocable to different parties in the unit. § 40–6–6(g) (3d and 4th sentences, quoted in note 2, *infra*). In order to perform these functions effectively and fairly, the Board must be able to resolve differences between the operator and a nonconsenting mineral owner as to

---

86 Ariz. 363, 370–72, 346 P.2d 1091, 1096–97 (1959), or even where it has exercised its independent judgment upon a de novo review of the entire administrative record. *Pasadena Unified School Dist. v. Comm'n on Professional Competence,* 20 Cal.3d 309, 572 P.2d 53, 55, 142 Cal. Rptr. 439, 441 (1977).

dollar amounts owing for periods prior to the effective date of the pooling order. The Board exercised this power, and the parties have not questioned its power to do so in an appropriate case. We hold that the power to make an order for the payment of money in the circumstances described above is implied in the powers the Act specifically confers on the Board.

## B. The Nonconsenting Owner's Rights Prior to Pooling

After initially contending that Bennion had no right to a share of the production (or the proceeds thereof) prior to the pooling order, Shell agreed to pay him a royalty prior to payout and the value of his share of production (less expenses) thereafter. In its brief in this Court, Shell characterizes this concession as a voluntary payment and renews its insistence that Bennion, as a nonconsenting mineral owner, had no vested rights to a share of production prior to the effective date of the pooling order. Although the correctness of that position is not tendered as a formal issue on this appeal (because of Shell's concession), it is fundamental to the reasoning of the parties on issues that are tendered. We therefore address it at the outset.

This appeal turns on the meaning of the version of § 40–6–6(g) enacted in 1966, quoted in the footnote.[2] Although superseded by amendments in 1977, the 1966 version governs the rights of the parties on the issues before us on this appeal, since this provision was in effect from the establishment of the drilling unit through the drilling of the well, the application for forced pooling, the attainment of payout, and for a year thereafter. We note in passing that the statute substituted by amendment in 1977, § 40–6–6(g) and (h), though more detailed, is substantially the same as the 1966 version in respects relevant to this appeal.

■ The proviso at the end of § 40–6–6(g) (quoted in note 2 herein) specifically grants the nonconsenting landowner "a basic landowners' royalty of one-eighth (⅛)" of the production allocated to his "tract" (or fractional share). Shell maintains that this provision only refers to the contents of forced pooling orders. However, in marked contrast to the first four sentences of this subsection, the fifth sentence (of which this proviso is a part) is not expressly so limited. The contrast is strongly sugges-

2. Utah Laws, 1966, 2d Sess., ch. 8, § 1:

[§ 40–6–6(g):] [1] Each pooling order shall make provision for the drilling and operation of a well on the drilling unit, and for the payment of the reasonable actual cost thereof, including a reasonable charge for supervision and storage facilities. [2] As to each owner who refuses to agree upon the terms for drilling and operating the well, the order shall provide for reimbursement for his share of the costs out of, and only out of, production from the unit representing his interest, excluding royalty or other interest not obligated to pay any part of the cost thereof. [3] In the event of any dispute as to such costs, the commission shall determine the proper costs. [4] The order shall determine the interest of each owner in the unit, and may provide in substance that as to each owner who agrees with the person or persons drilling and operating the well for the payment by the owner of his share of the costs, such owner, unless he has agreed otherwise, shall be entitled to receive, subject to royalty or similar obligations, the share of the production of the well applicable to the tract of the consenting owner, and, as to each owner who does not agree, he shall be entitled to receive from the person or persons drilling and operating the well on the unit his share of the production applicable to his interest, after the person or persons drilling and operating said well have recovered the share of the cost of drilling and operating applicable to such non-consenting owner's interest plus a reasonable charge for supervision and storage. [5] Each consenting and non-consenting owner shall be entitled to receive, subject to his paying or making arrangements with the owner or owners operating the well for the payment of all applicable royalties, over-riding royalties or other burdens on production and his respective share of current operating or other costs incidental to the efficient operation of the well, his share, respectively, of production allocated to the tract or tracts in which he holds an interest; provided, however, that a non-consenting owner of a tract in a drilling unit, which is not subject to any lease or other contract for the development thereof for oil and gas, shall be deemed to have a basic landowners' royalty of one-eighth (⅛) or twelve and one-half percent (12½%) of the production allocated to such tract.

tive that the fifth sentence is intended to apply without regard to whether there has been a pooling order.[3]

■ Consistent with the foregoing interpretation, the Board has previously held that this statute "allows the nonconsenting owner certain property rights which become effective when oil is produced upon a drilling unit." *In re Bennion, Board of Oil, Gas and Mining* Cause No. 139–18, p. 4 (Jan. 24, 1980). The Board applied that interpretation again in this case. Its reasoning is evidently that because of the drilling limit in the unit order the nonconsenting mineral owner is not at liberty to drill a second well. A vested right to some compensation is therefore essential to prevent the regulatory legislation from unconstitutionally depriving the nonconsenting mineral owner of his property without compensation. *E.g., Ward v. Corporation Commission,* Okl., 501 P.2d 503, 507 (1972).

■ We need not decide whether the Board's reasoning posits a binding constitutional requirement for retroactive application of pooling orders in all circumstances. *Compare Farmers Irrigation District v. Schumacher,* 187 Neb. 825, 194 N.W.2d 788 (1972), with *Anderson v. Corporation Commission,* Okl., 327 P.2d 699 (1958), *appeal dismissed,* 358 U.S. 642, 79 S.Ct. 536, 3 L.Ed.2d 567 (1959). It is sufficient for purposes of the prepooling order interests at issue in the present case for us to determine that the Board was well within the limits of reasonableness in construing the statute as granting such interests. This interpretation is consistent with the language of the statute, construed in terms of its stated purpose to protect the correlative rights of all property owners. § 40–6–1. We therefore affirm the Board's position that Bennion, as a nonconsenting mineral owner, had a vested right to a royalty prior to payout and a vested right to his statutory share (subject to payment of expenses) thereafter.

## C. The Cost-Free Royalty

The Board's calculation of Bennion's one-eighth royalty interest for the period prior to payout made no deduction for expenses. However, in the Board's view once payout occurred the royalty interest "merged" with the working interest. Thereafter, Bennion's share was calculated on the basis of his fractional share of the working interest (2.94898 percent), subject to his payment of his fractional share of the drilling and operating expenses from the beginning of development and drilling. Bennion charges that this calculation deprived him of his statutory "basic landowners' royalty," which he contends should be cost-free as to all costs incurred during the period for which the royalty was paid (i.e., prior to payout).

■ Here also, the Board made a reasonable—indeed, the only permissible—construction of its governing statute. The fourth sentence of subsection (g) (quoted in note 2, *supra* ), which prescribes the nonconsenting owner's share of production after payout, makes the owner's rights subject to the operator's first recovering the "share of *the cost of drilling* and operating applicable to such non-consenting owner's interest." (Emphasis added.) Since the cost of drilling is, by definition, a cost incurred prior to payout, Bennion's argument that he is entitled to a cost-free royalty prior to payout is meritless.

## D. Right to Production *In Kind* After Payout

Bennion wrote Shell on December 15, 1975, demanding his share of production "in kind." He testified that he had made earlier demands orally and that he had persisted in that demand to date. Bennion

---

**3.** This interpretation is further substantiated by the fact that § 40–6–6(f) apparently gives the Board discretion on whether to enter a pooling order on the application of an interested party ("the board ... *may* enter an order pooling all interests in the drilling unit" (emphasis added)).

If the proviso in subsection (g) only applied where there was a pooling order, then its fundamental protection of the mineral owner's interests would be subject to the discretion of the Board.

had a small interest in a refinery, and he was engaged in selling petroleum products at retail. He desired production in kind to improve his market position in those activities. Shell does not suggest that Bennion would have been unable to receive or handle oil or gas production in kind.

The Board order granted Bennion his share of production in kind following the effective date of the pooling order (July 26, 1979), but ordered payment of proceeds based on the value of production (as of the time of production) for the period between payout (May 1976) and pooling. Shell supports this order. Bennion contends that he should have received production in kind following payout. Calculating his rights on that basis would apparently require Shell to make current delivery of a quantity of products comparable to past production or to make equivalent payment based on current values, which are higher than the 1976–79 values on which Shell's calculations were based.

Bennion relies on the fact that the statute, quoted in note 2, refers throughout to "production" and never mentions "proceeds." This argument is unpersuasive, since at least one reference in subsection (g) to "production" cannot mean "product," but must mean the "proceeds from production."[4]

"Production" has been characterized as a term "of rather broad and comprehensive meaning...." 72 C.J.S. *Production* p. 1211 (1951). Its connotations are broad enough to include the "proceeds" or "value" of production where the context so requires. Perhaps this is why Bennion is satisfied with a cash payment for his royalty interest and seeks payment in kind only for his working interest, even though the statutory language defining each of those two interests makes an identical reference to the mineral owner's share of "production" (see note 2, *supra*).

■ The Board construed the statute as granting production in kind after the effec-

tive date of the pooling order, but as permitting cash payment based on the value of the mineral owner's vested interest prior to that time. Contrary to Bennion's argument, there is a rational basis for that distinction. Two of the statutory functions of pooling orders are to determine the interests of each owner in the unit and to fix the amount of drilling and operational costs. § 40–6–6(g) (3d and 4th sentences, quoted in note 2, *supra*). Until those issues are settled, there are significant practical obstacles to an operator's making an *in kind* delivery of a share of production to a nonconsenting landowner. How much product would be delivered, or how would the contested quantity be stored? The cash payment of proceeds—or their investment pending resolution of the controversy—poses far less practical difficulty.

In view of the broad connotations of the word "production" and the practical utility of construing the term to include "proceeds" or "value" during a period when it would be impractical to deliver or store the oil or gas in kind, we conclude that the Board's construction was well within the limits of reasonableness.

### E. Right to Interest on Proceeds of Working Interest

The Board awarded Bennion interest on the $14,334.48 Shell owed him as royalty for the period preceding payout, but made no provision for interest on the $57,887.93 Shell owed him for his working interest's net value of production after payout. Bennion attacks this omission of interest. Shell defends the omission solely on the basis that Bennion had no right to a share in the proceeds of production until the effective date of the pooling order. Having rejected Shell's premise, Part IIIB herein, we reject its conclusion also.

■ The Board gave no reason for its distinction (for purposes of interest) between amounts due as royalty and amounts

---

4. "[T]he order shall provide for reimbursement for his share of the costs out of, and only out of, production from the unit representing his inter-

est...." § 40–6–6(g) (2nd sentence, quoted in full in note 2, *supra*).

due on the working interest, and we can find no reason for such a distinction in the statute. Most importantly, both rights are vested in the mineral owner. Although both rights are subject to controversy as to precise amount (over such issues as the size of the interest, the value of production, and the amount of costs applicable to the interest), in both instances the controversies are susceptible of resolution by mathematical calculation. Both being circumstances in which "the loss is fixed as of a particular time and the amount of the loss can be calculated with mathematical accuracy," both circumstances are appropriate for the awarding of prejudgment interest. *Jorgensen v. John Clay and Co.*, Utah, 660 P.2d 229, 233 (1983), and authorities cited.

■■■ The same principles that motivate the awarding of interest for a period prior to the judgment of a court support the Board's award of interest on unpaid amounts for the production of minerals within a drilling unit. To assure the purpose of the Act, "that the correlative rights of all owners be fully protected," § 40-6-1, we hold that the Board has power to add interest at the legal rate to its money-payment orders under the Act. We further hold that in the circumstances of this case the standard of reasonableness in conforming to the purposes of the Act requires that the power be exercised as to all amounts owed to the mineral owner on his share of the working interest, as well as his royalty.

F. Transporting Shell's Records to Salt Lake City

Finally, Bennion contends that the Board abused its discretion in refusing to order Shell to transport its records from Houston to Salt Lake City for his examination.

Pursuant to Board rules and in response to issues Bennion had raised about Shell's production and cost reports, Shell gave Bennion full access to its well production and cost records in Houston. The Board even ordered Shell to pay his expenses and those of his accountant and lawyer to travel to Houston to examine them. Instead, Bennion had Houston-based accountants make a preliminary examination at that location and then sought a Board order requiring Shell to bring all of its records to Salt Lake City for further examination by his Utah accountants. Bennion contends that because the well is located in Utah, the records must be made available in Utah.

■■■ Time, place, and manner requirements relating to discovery are committed to the discretion of the tribunal. To pose the minimum interference with an ongoing business, books and records are generally produced, inspected, and copied at the place where they are in regular use by the business. 23 Am.Jur.2d *Depositions and Discovery* § 298 (1965); Annot., 83 A.L.R.2d 302, 309 (1962).

■■■ The complexity of certain business records may make their production illusory unless they are accompanied by summaries or explanatory material. This may be especially necessary in the context of a controversy between a large operator and a landowner with a royalty or working interest so small that the operator could prevail in any controversy over accountability simply by grudging or uncommunicative discovery practices. A tribunal has sufficient discretion to require discovery practices that are fair and effective in the circumstances of the pending controversy. On the facts of this case, we find no abuse of discretion in the Board's ordering Shell to pay travel expenses to Houston but refusing to order Shell to bring its records to Salt Lake City.

The judgment affirming the Board's order is affirmed, and the case is remanded to the district court for its remand to the Board with directions to add interest on the net amounts due on Bennion's working interest, as explained in Part IIIE herein. No costs awarded.

HALL, C.J., and DURHAM and HOWE, JJ., and DEAN E. CONDER, District Judge, concur.

STEWART, J., having disqualified himself, does not participate herein.

CONDER, District Judge, sat.