**S.H. BENNION, Plaintiff and Appellant,**

v.

**GULF OIL CORPORATION, a Pennsylvania corporation, and the Utah State Board of Oil, Gas and Mining, an agency of the State of Utah, Defendants and Respondents.**

**No. 19144.**

Supreme Court of Utah.

Aug. 19, 1985.

Rehearing Denied March 21, 1986.

Reid Tateoka, Peter Stirba, Stephen W. Rupp, Salt Lake City, for plaintiff and appellant.

John R. Kunz, Hugh C. Garner, David L. Wilkinson, Atty. Gen., Barbara Roberts, Salt Lake City, for defendants and respondents.

HOWE, Justice:

Appellant S.H. Bennion appeals from a summary judgment granted in favor of respondents Gulf Oil Corporation and the Utah State Board of Oil, Gas, and Mining. He seeks reversal of the judgment and contends that summary judgment in his favor should have been granted.

Bennion holds mineral interests which without his consent were made part of an oil drilling unit designated by the Board, as permitted by the Oil and Gas Conservation Act, U.C.A., 1953, §§ 40–6–1 to –19 (1981). By a 1972 order of the Board, Gulf was the producer authorized to drill the single production well allowed on the 640-acre unit. As a nonconsenting interest owner, Bennion was entitled under the act to his proportionate share of the oil and gas produced from the unit minus his proportionate share of the cost of drilling, production, and maintenance.

Gulf drilled a producing well on the 640-acre unit and recouped its drilling costs. Bennion was thus entitled to receive and in fact was receiving his proportionate share of the oil and gas produced on the unit minus the relatively low cost of production and maintenance. Without notice or hearing, but with permission given by a staff engineer of the Division of Oil, Gas, and Mining on August 25, 1980, Gulf commenced drilling a second well as an infill test well within the 640-acre unit. Bennion petitioned the Board to enjoin the drilling on the basis that a second well was in violation of the Oil and Gas Conservation Act and the Board's prior unitization order. The Board determined that the drilling of a second well as a test well was not in violation of its prior order and that, inasmuch as it was a test well, Bennion was not required to pay any of its drilling costs. However, the Board added that if it were to redesignate the test well as a production well, Bennion would then be responsible for his proportionate share of those costs. Subsequently, Gulf "shut in" the first well and applied to have the second well designated as the production well. After a hearing, the Board changed the designation of the second well from a test well to that of the unit's production well and ordered Bennion to pay his share of the $1.4 million drilling cost. Bennion appealed the Board's order to the district court.

Pursuant to U.C.A., 1953, § 40–6–10(b), appellant was entitled on his appeal to a determination of the "issues on both questions of law and fact" by the district court. On the parties' cross-motions for summary judgment, the court determined from the transcript of the hearing before the Board that the Board had acted properly and within its authority. Summary judgment in favor of Gulf was entered.

For purposes of this opinion, we shall assume that the Oil and Gas Conservation Act allows a staff engineer to authorize the drilling of a test well on a producing unit. We note that the issue is raised, but not argued, in the briefs of counsel and that the act is not clear on the issue. *See* U.C.A., 1953, § 40–6–3. However, even as-

suming that the statute allows such a delegation of authority, we cannot agree with the district court's affirmance of the Board's order redesignating the test well as the production well and holding Bennion responsible for a proportionate share of the cost of drilling the second well.

Although the Oil and Gas Conservation Act was first enacted in 1955, we have had little opportunity to construe its provisions. A cursory reading of the act discloses, however, that in at least two places it is contemplated that only one well should be drilled per unit. For example, section 40–6–6(b) provides:

In establishing a drilling unit, the acreage to be embraced within each unit and the shape thereof shall be determined by the board from the evidence introduced at the hearing but shall not be smaller nor greater than the maximum area that can be efficiently and economically drained *by one well.*

(Emphasis added.) Subsection (c) provides:

Subject to the provisions of this act, the order establishing drilling units shall direct that *no more than one well* shall be drilled for production from the common source of supply on any unit....

(Emphasis added.) We find nothing in the act which expressly allows a test well to displace the production well from a common source of supply on the unit. The only reference to the drilling of additional wells is found in subsection (d) where it is provided:

When found necessary for the prevention of waste, or to avoid the drilling of unnecessary wells, or to protect correlative rights, an order establishing drilling units in a pool may be modified by the board to increase the size of drilling units in the pool or any zone thereof, to decrease the size of drilling units or to permit the drilling of additional wells on a reasonably uniform plan in the pool, or any zone thereof.

The Board's order in the instant case did not purport to comply with this subsection. The order did not authorize the drilling of additional wells on a uniform plan "in the pool or any zone thereof."

The Board made its order approving the second well as the production well for the unit and charging Bennion for his proportionate share of the cost of drilling in reliance on section 40–6–1, which is entitled "Declaration of Public Interest:"

It is declared to be in the public interest to foster, encourage, and promote the development, production, and utilization of natural resources of oil and gas in the state of Utah in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas may be obtained and that the correlative rights of all owners be fully protected; to encourage, authorize, and provide for voluntary agreements for cycling, recycling, pressure maintenance, and secondary recovery operations in order that the greatest possible economic recovery of oil and gas may be obtained within the state to the end that the land owners, the royalty owners, the producers, and the general public may realize and enjoy the greatest possible good from these vital natural resources.

The Board further justified its action on its finding that the first well at the time it was shut in was at the point of marginal recovery of further oil or gas or both of them. At the hearing before the Board, Gulf introduced production reports of the second well for the first three months of its operation which showed higher production than the first well. However, Gulf did not know if the second well would be a commercial well or even if its total production would exceed that which would still be produced by the first well. Gulf's expert witness testified:

We have no idea of what the extent of the reservoir is. We can't know that at this time. We realize that this whole field is—apparently the reservoir due to the geological structure of the thing—it's almost impossible to determine what's going to happen from one well to the

next as far as correlating sands and production.

We acknowledge the legislative mandate in section 40–6–1 to promote the development of our state's oil and gas resources. We do not believe, however, that the broad declaration of public interest contained therein was meant to override the specific statutory restrictions on the drilling of an additional well on any unit.[1] Moreover, we note that the declaration of public interest calls for "the greatest possible economic recovery of oil and gas," which provides the basis for Bennion's complaint that the evidence is lacking as to whether the second well will ever pay out. We also note the legislative intent expressed in section 40–6–6(a) that the drilling of unnecessary wells be avoided. Thus, aside from the fact that there does not appear to be any statutory authority for the action of the Board, the evidence was insufficient to demonstrate that it was more equitable or reasonable to shut in the first well and redesignate the second well as the production well. More importantly, the evidence fails to justify the trampling of a nonconsenting mineral interest owner's correlative rights in charging him with the added and speculative expense of drilling the second well.

We have examined Gulf's res judicata defense and find it to be without merit.

The Board erred in its redesignation of the second well as the production well for the unit, and the district court erred in affirming the Board's order. We vacate the Board's order in cause number 139–20(B) and remand the cause to the Board with the instruction to enter an order that the second well is and has been producing in violation of U.C.A., 1953, § 40–6–6(e) and relieve Bennion of all obligation to share in the cost of drilling.

HALL, C.J., and DURHAM and ZIMMERMAN, JJ., concur.

STEWART, J., concurs in the result.

1. In 1983, two years after the hearing before the Board in the instant case, extensive amendments were made to the Oil and Gas Conservation Act. Properly, we have not considered them in our analysis and decision.