ALBERT SMITH, Plaintiff-Appellant, *v.* PAT O'KEEFE *et al.,* Defendants-Appellees.

(No. 71-103;

Fifth District—February 2, 1973.

*Rehearing denied March 9, 1973.*

Harris and Lambert, of Marion, for appellant.

William W. Hart, Jr., City Attorney, of Benton, for appellees.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Plaintiff appeals from a judgment of the Circuit Court of Franklin County which confirmed a decision of the Board of Fire and Police Commissioners of the City of Benton discharging the appellant, Albert Smith, as a Benton fireman.

Appellant, who had been employed as a fireman by the City of Benton for four years, was discharged by the Benton Board of Fire and Police Commissioners after a hearing on various charges of misconduct. He then filed a suit in the Circuit Court of Franklin County under the Illinois Administrative Review Act, seeking to set aside the order of the Board. The Circuit Court confirmed the Board's order of discharge and the plaintiff appeals.

■■ In our view, the principal point in this appeal is whether or not the findings of the Board were against the manifest weight of the evidence. The duty of the reviewing court on appeal from a circuit court order confirming the decision of an administrative body, is to examine the

entire record to determine whether the findings of such a body on questions of fact are contrary to the manifest weight of the evidence. (*Dorfman v. Gerber,* 29 Ill.2d 191.) And, when the administrative order is contrary to the manifest weight of the evidence, it is the duty of the reviewing court to set it aside. *Russell v. License Appeal Com. of the City of Chicago,* 133 Ill.App.2d 594, 273 N.E.2d 650.

The pertinent section of the Cities and Villages Act (Ill. Rev. Stat., 1969, ch. 24, par. 10—2.1—17), provides:

> "Removal or discharge—Investigation of charges—Retirement.) Except as hereinafter provided, no officer or member of the fire or police department of any municipality subject to this Division 2.1 shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense. The board of fire and police commissioners shall conduct a fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof, which hearing may be continued from time to time. In case an officer or member is found guilty, the board may discharge him, or may suspend him not exceeding 30 days without pay."

A complaint was filed by the fire chief, Pat O'Keefe, and the assistant fire chief, Claude Grimes, making certain allegations against appellant and requesting the Board to discharge him from his duties as a fireman. In its decision the Board found that appellant had conducted himself in a manner not befitting a member of the fire department by (1) leaving the fire department headquarters while on active duty and without permission on February 26, 1969, and May 4, 1969; (2) by leaving the scene of a fire without permission from his superior on October 10, 1969, and December 24, 1968; and (3) by calling Assistant Chief Grimes a vile and degrading name while on duty and in the presence of other firemen. The Board found that the charges with reference to the failure to respond to fire calls while not on duty had not been proven.

The Board further stated in its order that the rules and regulations established by the fire department itself had not been in each instance specified with all desirable particularity and that, from time to time, the chief or officer in charge had given permission for absences from the fire station when an emergency could have made such absences undesirable and that the rules had not been applied with complete consistency. The Board further stated that "the Commission finds that any regular fireman *must* have known by information and observation during the period of probation that individual firemen attending fires are obliged to remain at the scene of the fire until dismissed by the person in charge and not for each fireman to exercise his individual discretion." The Board further

stated that sound public opinion would recognize these failures and omissions as good cause for his no longer occupying the position of fireman. The Board also pointed out that they were not condoning all of the conduct about which evidence was introduced on the part of officers and regular firemen of the department, but they could not discuss such here because no charges were filed against other persons.

The incidents which the Board found to constitute good cause for the dismissal of the appellant will be reviewed in chronological order.

The first incident occurred on December 24, 1968 during a fire at the Isaac residence. The charge was leaving the scene of a fire without the permission of his immediate superior.

One of the complaining witnesses, O'Keefe, testified that, after having complaints from two other firemen (presumably John Smith and James Manion) as to why the appellant was always the first to leave fires, he went around to the front of the Isaac house and found neither Albert Smith nor the fire truck. However, he did not testify that the fire was not over when he found that the appellant was gone. He also admitted never having asked the appellant whether he left the scene of the fire or not, and admitted that he did not see him leave. Both John Smith and Manion testified that the appellant was only at the fire ten minutes and then left. They also testified that the fire lasted from an hour to an hour and a half. When called during rebuttal testimony, John Smith stated that shortly after they got to the fire the decision was made not to use the truck which the appellant had driven to the fire, but to save it in case they had another fire. Therefore, the truck which was driven by the appellant should have been returned to the fire house immediately. Thus, his testimony appears to be somewhat inconsistent. The only witness substantiating the claimant's case against the appellant is James Manion. Appellant attempted to show bias and prejudice on the part of Manion, but was not allowed to do so.

Appellant denied that he left the scene of the fire without permission and further testified that he was there until the fire was out and heard O'Keefe say to roll up the hoses and go in. His story was substantiated in its entirety by Charles Webster, a volunteer fireman, who stated that the appellant was still there when O'Keefe said, "Let's roll up the hoses and go in." Webster testified that he was back at the firehouse three to five minutes before the defendant was. Four other impartial, independent and disinterested witnesses (Birdie Smith, Cockrum, Craig and Canada) testified that they saw the appellant fighting the fire and saw him go inside the house, pulling the hose to fight the fire. Birdie Smith and Dorothy Cockrum testified that the appellant was still standing around with the other firemen after the fire was out and smoldering. The appel-

lant testified that he was at the fire for an hour. Craig corroborated the appellant's testimony when he referred to a plastic face shield that had broken in the fire and that he had handed it to the appellant after the fire was over.

Richard Canada, a deputy sheriff, was at the fire at least a half-hour and saw the appellant pulling hoses and going inside the house. He testified that the fire truck did not leave while he was there.

Appellant further testified that Carl Tedrow, another volunteer fireman, rode back to the fire station with him in the truck. Tedrow denied this, but two disinterested witnesses, Lampley and Biggs, both testified that Tedrow had previously admitted that he did ride in on the fire truck with the appellant after the fire was extinguished.

■■ The evidence by disinterested and impartial witnesses is overwhelming to the effect that the appellant did not leave within ten minutes, as testified to by John Smith and Manion. However, the evidence is inconclusive as to whether he was the last to leave (as the appellant contends). Nonetheless, the manifest weight of the credible evidence does indicate that he did not leave until the fire was out. The appellant's version of what transpired at the Isaac fire is substantially supported by seven other independent witnesses, as opposed to the two questionable witnesses in support of the complainant. Actually, the only clear, consistent testimony to the effect that the appellant left before the fire was out was that of James Manion, who, throughout the proceeding the appellant had attempted to show as biased and prejudiced against him. The Board erroneously refused an offer to prove that James Manion and Claude Grimes had made a bet with each other that the appellant would be gone from the fire department by November of 1969. Evidence of potential bias and prejudice is permissible in such situations. *People v. Somerville*, 88 Ill.App.2d 212; *Blanchard v. Blanchard*, 191 Ill. 450.

■■ In our opinion, the foregoing finding was against the manifest weight of the evidence.

■■ The second incident occurred on February 26, 1969. The charge was leaving the fire department headquarters without permission.

Appellant admitted that, while on duty, he went to the fairgrounds two different times on the evening in question (at 9:00 P.M. and 11:00 P.M.) but insisted that the trips were only for ten minutes each and that each trip was at the direction of the assistant fire chief, Grimes. He testified that he went to the hospital to see Grimes shortly before reporting for work that night, and, in a conversation with Grimes, Grimes told him to go check on a horse which was about to foal. Grimes denied the above conversation, but admitted that he had an agreement with the appellant whereby appellant was to take care of his horses and collect the rent

and water bill and turn it over to the fair board. He further testified that the appellant had no interest in the horse which was about to foal and that he (Grimes) agreed to give the appellant one-half of whatever he made on the horses.

Appellant also testified that he had, many times, seen Grimes, while Grimes was on duty, go out to the fairgrounds and check the horses. The appellant was not permitted to prove this on cross-examination of Grimes, but when Grimes was recalled at a later point in the hearing, he admitted that he had, on a number of occasions while on duty, gone out to check on his horses.

Don Dillon, a witness offered by the complainants, said that the appellant was in Grime's hospital room shortly before he went to work on this particular night. However, he denied that there was any conversation in regard to the horse which was to foal on that particular night. Dillon stated that later that night he saw the appellant at the fairgrounds checking the horse. He further testified that the appellant said he was out there to see if the mare had the foal and that the mare belonged to Grimes; that the appellant had been doing some work regarding the horses previously for Grimes; and that Grimes had previously paid the appellant for work regarding the horses.

John Smith testified that on that night appellant left shortly after 9:00 P.M. and did not return for the rest of the night. He later impeached his own testimony by giving an inconsistent statement which substantially supported the appellant's contention that he had been gone only a short time and had come back and then had gone again.

While it is difficult to believe that the appellant would go out to the fairgrounds to check on a horse in which he had no interest, it cannot be said that the finding of the Board is against the manifest weight of the evidence. Dillon corroborated Grimes's version that there was no express permission given and, since the appellant does not argue that there was ever any prior permission given to appellant by Grimes to check on the horses (as was done in the third incident), there can be no serious question of "implied" permission. The appellant has successfully established that there was some business relationship between himself and Grimes. However, merely because the assistant chief left his post to check on his horses, that cannot be considered "implied permission" for the appellant to leave his post while on duty.

In our opinion, the foregoing finding was not against the manifest weight of the evidence.

The third incident occurred on May 4, 1969 when the appellant left the fire department headquarters to drive his wife home. The charge was leaving the fire department headquarters without permission.

Once again, the appellant admits having left the fire department headquarters but contends it was only as a result of permission given by the chief and the assistant chief themselves. O'Keefe had testified that the firemen could leave the station while on duty so long as they got permission either from the chief or assistant chief. O'Keefe admitted having given appellant permission on many occasions to take his wife home while the appellant was on duty. He stated that he had given permission. to the firemen on an extended basis, for a while, to go across the street to get coffee. O'Keefe also testified that he had given the appellant permission in the past and that he could not recall whether he gave permission to the appellant on that particular night. Appellant's wife testified that she brought Albert their only car so he would have a ride home the next day when he got off duty. They live ten blocks away. Appellant drove her to her mother's house.

Both before and after this particular event, the appellant was given permission to take his wife home as he did on this particular occasion. O'Keefe testified that he did not recall if the appellant had asked him, prior to May 4, 1969, if he could take his wife home this particular evening. However, he did not testify that he did not give such permission. Appellant and his wife both testified that about a month before this hearing, the assistant chief, Grimes, told the appellant he could take his wife home while appellant was on duty provided he return to the station immediately. Grimes did not testify to the contrary. O'Keefe also corroborated this despite his many "lapses of memory" in regard to the extent and dates of the permission which was given in the past. An independent witness, Paul Lampley, corroborated this event. The fire chief, O'Keefe, testified that when this event occurred, he did not consider it serious enough to dismiss the defendant. There was never any written rule in regard to the leaving of the fire station while on duty.

▌▌ In light of the absence of any written rules during the time of this alleged violation; in light of other evidence of the practice of allowing the firemen to leave with or without permission; in light of the total absence of written rules in this regard, even when the written rules were posted; in light of the evidence that the appellant did, in fact, receive permission on numerous occasions for such absence; and in light of the lack of any positive evidence that he did not receive permission on this date, in our opinion the finding of the Board as to this charge was against the manifest weight of the evidence.

The fourth incident, a fire on I-57, occurred on October 10, 1969. The charge was leaving the scene of a fire without permission.

This incident involved a truck fire on I-57 three miles south of Benton. The assistant chief, Grimes, testified that the appellant left without per-

mission. O'Keefe, the fire chief, was not on duty, but was at the fire. He left a short time before the appellant left and testified that when he left, the fire was over. The appellant and James Sullivan were in the same fire truck. Sullivan drove the truck and Albert Smith was merely a passenger to and from the fire. The evidence indicates that in leaving, the truck in which the appellant was seated drove south two or three miles to a turn-off, made a U-turn, and came back in a northerly direction toward Benton, driving past the burned truck, past Claude Grimes, and back to the fire house. Grimes admitted seeing the truck leave, admitted that he had a radio in his car and in the fire truck, and that at no time did he attempt to stop the truck as it left or as it passed by them on the way back to the fire house. Grimes stated that the fire was "for all practical purposes out"; that he sent John Smith to tell the appellant not to leave, but did not know if he was ever told; that there was considerable ill-feeling between appellant and himself; and that nothing further was done to the truck (which had been burning) after the appellant and Sullivan drove off. John Smith never testified that he relayed the alleged message from Grimes.

Sullivan, the driver of the truck, testified that appellant had told him that Grimes had given them permission to leave. However, he also testified that he did not trust the appellant and that it was the common custom that the person who drove the truck (Sullivan) get permission from the acting superior to leave. When they got back to the fire station in the truck, Grimes asked only Sullivan why he had left the fire. There has been no disciplinary action taken against the driver of the truck, Sullivan. In fact, the fire chief, O'Keefe, testified that he thought Sullivan did not leave without permission. Sullivan testified that when they left, the fire was apparently out.

Appellant testified that the fire was out when he left the scene of the fire. His testimony was corroborated by three disinterested, impartial and unimpeached witnesses. All three of them said that the fire truck did not leave until the fire was out and the wrecker was backing up to the truck that had been on fire and was hooking onto the truck before the hoses to the fire truck were rolled up.

The overwhelming weight of the evidence indicates that the fire was out when the appellant and Sullivan drove off in the fire truck. Thus, the appellant could not be guilty of "leaving the scene of a fire" as charged in the findings of the Board.

The question of whether or not the appellant had permission to leave is not as easy to resolve. The evidence is conflicting. However, the evidence does indicate that the appellant did not disobey a direct order not to leave. In addition, in light of the lack of any definite standards

or rules in this regard, it seems unlikely that leaving a fire that has been extinguished, even though possibly without the permission of his immediate superior, could be considered a ground for dismissal. Grimes could have stopped the appellant and Sullivan if he felt they were leaving without his permission. It must be emphasized, as was done on the administrative level, that this court does not approve of the lack of clear and precise standards to guide the conduct of a fireman, nor would we disturb the presumably correct findings of the Board if there was sufficient evidence that the appellant had left the scene of a fire as charged by the complaint. However, the evidence overwhelmingly indicates that the fire had been put out at the time the appellant and Sullivan entered the truck to go back to the fire house. In light of the unstructured, unprofessional environment of the City of Benton's Fire Department, it cannot be said that the defendant "must have known" that he could not leave the scene of an extinguished fire without explicit permission.

In our opinion, the finding of the Board on this charge is against the manifest weight of the evidence.

The fifth incident occurred on January 17, 1970, when the appellant allegedly called Grimes a "son of a bitch". The charge was insubordination to a superior officer.

John Smith and Claude Grimes testified that when Grimes walked in, John Smith said to appellant, "Here comes Claude", and appellant said, "I see the son of a bitch." Both Grimes and John Smith testified that that was all the conversation that was had at that particular time. Grimes admitted that there was considerable ill feeling between him and the appellant prior to January 17, 1970. Later, Grimes admitted that there was a considerable amount of other conversation that was had at that time (when the appellant allegedly called him a vile and degrading name), but the appellant was not allowed to cross-examine him regarding that conversation. Grimes also admitted that it was true that he used profanity and vulgarity towards the appellant at this time. He also said that he and the appellant had been at odds with each other for quite some time.

Appellant denied the conversation that John Smith and Claude Grimes related and stated that when Claude Grimes walked in the first thing that was said by Grimes was, "I don't know what's keeping me from beating the shit out of you." Appellant related that there was other conversation about an alleged phone call by the appellant to Grimes's mother-in-law.

From that point on, the testimony of the appellant is substantially corroborated by other witnesses and uncontradicted by the complainants. Thereafter the appellant signed off duty at 3:00 P.M., signing out sick,

and went to see Jim Knight, the City Commissioner. Richard Canada testified he took the appellant to Knight's Furniture Store that afternoon and appellant looked nervous and "shook up". Appellant contends that he looked nervous and "shook up" because he had been threatened by Grimes. Knight testified that appellant came to his place that afternoon and that he went back to inquire of Grimes about 5:00 P.M. as to what had happened. Grimes could tell him only that the appellant took off sick. Grimes admitted that Knight came to see him about what had happened.

In regard to the actual use of the words "son of a bitch", although the version of Grimes and John Smith seems highly improbable, there are two witnesses who state that that is what occurred. There were only three people present when the words were used, so the weight of the evidence is obviously not in favor of the appellant.

■■ Although the finding of the Board in this regard is not against the manifest weight of the evidence, error was committed when the appellant was not permitted to cross-examine Grimes in regard to the full conversation. In order to understand how the words "son of a bitch" were used, it was important to understand the context in which the words were spoken. Also, this "other conversation" could very well impeach Grimes's version of what transpired in regard to the words used by the defendant. The details of a quarrel, when relevant, should be examined on cross-examination. IIIA Wigmore, ch. 33, par. 951.

Two of the findings of the Board still stand—the second (February 26) and the fifth (January 17) incidents. However, in view of the unprofessional working conditions of this fire department, we find it difficult to believe that the remaining violations constitute "good cause" for the discharge of the appellant. The Board itself, in its order, expressed shock at the lack of disciplined procedures testified to at the hearing. There was extensive testimony that the firemen were often away from their posts of duty for short periods. It appears that there were no written rules until the end of 1969, and even these rules make no mention of leaving the firehouse without permission while on duty. The Board's order also indicates that the rules, whatever their form, were not applied with an even hand.

For the foregoing reasons the judgment of the Circuit Court of Franklin County is reversed and this case is remanded to the Circuit Court of Franklin County for proceedings consistent with this opinion.

Reversed and remanded.

EBERSPACHER and CREBS, JJ., concur.