*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2017 UT 65**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JERAMEY MCELHANEY and MARY MCELHANEY,
*Appellees,*

*v.*

CITY OF MOAB and MOAB CITY COUNCIL,
*Appellants.*

No. 20160142
Filed September 21, 2017

On Direct Appeal

Seventh District, Moab
The Honorable Lyle R. Anderson
No. 140700048

Attorneys:

Craig C. Halls, Blanding, for appellees

Christopher G. McAnany, Grand Junction, CO,
for appellants

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM and JUSTICE HIMONAS joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1　The Moab City Council (Council) denied Mary and Jeramey McElhaney's application for a conditional use permit to operate a bed and breakfast in their residential neighborhood. The McElhaneys appealed to the district court, which reversed the Council's decision. Moab City (Moab) and the Council seek our review. We first clarify that, contrary to what we have suggested in some cases, we review the district court's decision and not the Council's. We next conclude that the district court correctly recognized that the Council had not generated findings sufficient to

support its decision but erred by refusing to send the matter back to the Council for the entry of more detailed findings of fact and conclusions of law. Accordingly, we vacate the district court's decision and remand with instructions to the district court to remand the matter back to the Council.

## BACKGROUND

¶2 Mary and Jeramey McElhaney (collectively McElhaneys) submitted an application for approval of a conditional use permit for a bed and breakfast facility to be located on their property. The McElhaneys' property is located in an R-2 residential zone. An R-2 zone allows residential dwellings and limited commercial uses. Moab, Utah, Mun. Code § 17.45.020 (2017). The Moab Municipal Code recognizes that a bed and breakfast facility may be allowed, in some circumstances, as a conditional use in an R-2 zone. *Id.* § 17.09.530(B). The proposed bed and breakfast would be the only commercial property in a cul-de-sac of single-family residences.[1] At the time of their application, the McElhaneys operated a child-care business on the street, which they planned to close once they opened the bed and breakfast.

¶3 In September 2014, the Planning Commission (Commission) convened a public hearing to review the application. Several neighbors voiced their concerns at the hearing. Comments primarily addressed issues of traffic, noise, parking, lighting, storm water drainage, and general incompatibility with the neighborhood. The Commission directed city staff to investigate the concerns and report back. The McElhaneys wrote a letter to the Council to address the concerns raised at the public hearing. They indicated that the bed and breakfast would include off-street parking, decrease traffic once they closed the daycare, be constructed in a way that avoided drainage issues, and ultimately increase property values.

¶4 The city staff investigated the complaints and the McElhaneys' proposed solutions. For example, the staff examined the concerns about increased traffic. The staff estimated that a bed

---

[1] The Council amended Moab Municipal Code section 17.09.531(9)(B)(1) in 2017 to specifically prohibit bed and breakfasts "on a cul-de-sac [or] dead end street." The parties have not asked us to opine on the impact of the amendment on this dispute.

and breakfast would generate up to 8.9 average daily trips per unit—fewer than a single-family residence's 10 to 12 average daily trips. It also found that the McElhaneys' plan included sufficient off-street parking to meet the Moab Municipal Code's requirement.

¶5 The Commission recommended approval of the conditional use permit, subject to the following conditions:

> 1. The bed and breakfast shall be reviewed each year for code compliance;
>
> 2. All lighting shall be downward directed and full cutoff as required by [Moab Municipal Code] 17.09.660(H), Lighting Plan.
>
> 3. Fencing and/or landscaping shall be used to buffer the parking area and the entrance from the street. . . .
>
> 4. The daycare center will discontinue operations once the bed and breakfast facility is operational.

The Commission found that the McElhaneys could mitigate the negative impact of the bed and breakfast if it abided by these conditions.

¶6 The Council, acting as the land use authority, considered the conditional permit application at a public hearing. Citizens again voiced a number of concerns. Increased noise and traffic were the most frequently aired problems. Many expressed unease that the bed and breakfast would attract tourists with loud Jeeps, utility task vehicles (UTVs), and all-terrain vehicles (ATVs). Nearly everyone who spoke at the Council meeting worried that visitors to the bed and breakfast would drive motorcycles or ATVs up and down the hill past their houses multiple times. Many also feared that the increase in traffic would endanger neighborhood children who frequently play in the streets. Several residents also commented that the presence of a commercial property would alter the integrity and dynamic of the neighborhood. A few people complained of potential light pollution, decreased property values, and possible road deterioration.

¶7 The Council denied the McElhaneys' application by a 3-1 vote at a Council meeting in November 2014. The Council did not make explicit findings on whether the proposal met the requirements the Moab Municipal Code imposes. However, each councilmember explained the rationale behind his or her vote.

¶8 Councilmember Kirstin Peterson voted against the permit. She suggested that the proposed use did not meet the criteria that it be "consistent with the city of Moab general plan." *See id.* § 17.09.530(H)(7). She noted that, under Moab's general plan, "one of the five goals is to restrict commercial development in residential . . . zones," and she believed that approval of the conditional use permit would effectively "force a commercial business on a residential area that clearly is not interested in creating a commercial zone." Considering "the unique characteristics of this neighborhood," Councilmember Peterson said the bed and breakfast is "not an appropriate use."

¶9 Councilmember Heila Ershadi also voted against the proposal. She stated that the "number one concern" among locals was "the character of the town." She concluded that because locals worried that "the tourism trade is just taking over and there's less and less space that belongs to locals," she could not support the McElhaneys' proposed use.

¶10 Councilmember Kyle Bailey was the third vote against grant of the permit. Bailey reasoned that "the clear intent of [the minimal negative impact requirement] was to listen to the people in the neighborhoods and to do what the neighborhoods wished." He stated that the bed and breakfast "is going to be an impact on the neighborhoods and I can't support this." Councilmembers Peterson, Ershadi, and Bailey did not speak directly to whether the McElhaneys could mitigate the potential adverse impacts or why the conditions the planning commission recommended would be insufficient to ameliorate the bed and breakfast's negative effects.[2]

¶11 Only Councilmember Gregg Stucki voted to approve the McElhaneys' conditional use permit. He spoke from his experience as a bed and breakfast owner. He first explained that the conditional use permit system operated by "rules that are in place and not our own personal preferences or public opinion." He addressed "some

---

[2] Councilmember Peterson briefly remarked that certain uses might be compatible "only if certain conditions are required that mitigate or eliminate detrimental impacts." However, she did not comment on how the McElhaneys had failed to propose ways to mitigate potential adverse impacts or the Commission's mitigation recommendations.

incorrect assumptions . . . about the type of people that frequent [bed and breakfasts]." He opined that "[b]y and large, [bed and breakfast] guests are well educated, they're successful professionals, they tend to be active, health[-] and environmentally-conscious." Based on this observation, Stucki said that the McElhaneys would not likely "be able to buck the trend and cater primarily or exclusively to ATV and motorcycle enthusiasts." He concluded that bed and breakfasts "have not been, nor are they currently a menace or disruption to the regular flow of neighborhoods that some believe they could be."

¶12    The McElhaneys appealed to the district court. At a hearing before the court, the McElhaneys argued that among the public's concerns of "appearance, architecture, scale, design, noise, traffic, [and] parking," the key complaints included "the traffic and the noise." At the hearing, the judge expressed dismay at the Council's failure to articulate the basis for its decision. The district court complained that in the Council's assumed role as fact finder, it didn't "actually find facts." Moab responded that it believed the Council had produced an appropriate order, but that if the court identified "any defect in [the decision] process . . . the appropriate remedy . . . is to remand for further findings."

¶13    The district court overturned the Council's decision. First, it held that speculative evidence "d[id] not support a finding of undue increase in traffic." Because the record did not indicate the number of homes on Arches Drive, the court took judicial notice of a Google map.[3] The court also found that concerns about increased noise constituted "mere speculation." It reasoned that any negative noise impact would be effectively mitigated by the McElhaneys' residence at the bed and breakfast and Moab's authority to deny renewal of the annual permit. The district court suggested that the permit might have been denied "because of other negative effects that are not 'clearly minimal.'" But it held that "the City has a responsibility to articulate what those negative effects are likely to be" and concluded that Moab had failed to do so. Because the McElhaneys met specified requirements for obtaining a conditional use permit, and since "[t]he only contrary evidence is not substantial, but speculative only, based

_____

[3] The district court opined that it could take judicial notice of the map under Utah Rule of Evidence 201, which allows a court to take judicial notice of a fact that "is not subject to reasonable dispute." We are not asked to review this decision.

on the expressed fears of neighbors," the district court overturned the Council's decision to deny the McElhaneys' application.

¶14  Moab appeals the district court's decision. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

**STANDARD OF REVIEW**

¶15  We have said that "'[w]hen a lower court reviews an order of an administrative agency and we exercise appellate review of the lower court's judgment, we act as if we were reviewing the administrative agency decision directly' and 'do not defer, or accord a presumption of correctness, to the lower court's decision.'" *Carrier v. Salt Lake Cty.*, 2004 UT 98, ¶ 17, 104 P.3d 1208 (citation omitted). The parties disagree about what it means to "review[] the administrative agency decision directly." *See id.*

¶16  The McElhaneys contend that we should review the Council's decision and not the district court's order. Moab, in contrast, attacks the district court's order and not the underlying Council decision. Moab argues that "[l]ack of deference to a trial court judgment does not mean that the appellate court must ignore the trial court decision."

¶17  The parties' difference of opinion nicely frames the two ways in which our case law can be read. If you focus on the part of the standard that states, "we act as if we were reviewing the administrative agency decision directly," you could be tempted to conclude that we will ignore the district court's holding and act as if that proceeding never took place. *See id.* (citation omitted). If you focus on the "do not defer, or accord a presumption of correctness, to the lower court's decision" portion, then the test looks more like how we review a court of appeals decision on a petition for certiorari. *See id.* (citation omitted).

¶18  The statement that we review administrative decisions challenged on appeal "just as if the appeal had come directly from the agency" emerged from our holding in *Bennion v. Utah State Board of Oil, Gas & Mining*, 675 P.2d 1135, 1139 (Utah 1983). There, we analyzed what standard of review we should apply "in reviewing the district court's judgment" in an appeal of a decision of the Board of Oil, Gas and Mining. *Id.* We noted that "a minority" of courts "affords some deference to the reviewing judgment of the lower court." *Id.* at 1140. But we opted to follow the majority approach that "gives no presumption of correctness to the intervening court

decision, since the lower court's review of the administrative record is not more advantaged than the appellate court's review." *Id.* at 1139.

¶19   In *Bennion,* we did not analyze whether the order we review is that of the administrative body or of the intermediate court. The cases we relied upon to reach our decision in *Bennion* appear to go both ways on that question. Many of them stood for the proposition that a court should "review the judgment of the [intermediate] court without any presumption of its correctness." *Ala. Pub. Serv. Comm'n v. Nunis*, 39 So. 2d 409, 412 (Ala. 1949); *accord Kelly v. Kansas City*, 648 P.2d 225, 229 (Kan. 1982) ("[I]n reviewing a district court's decision the Supreme Court will, for the purpose of determining whether the district court observed the requirements and restrictions placed upon it, make the same review of the administrative tribunal's actions as does the district court."); *Cook v. Iowa Dep't of Job Serv.*, 299 N.W.2d 698, 701 (Iowa 1980) ("[W]hen this court reviews a decision of a district court . . . the sole question is whether the district court correctly applied the law." (citation omitted)); *see also Gourley v. Bd. of Trs. of S.D. Ret. Sys.*, 289 N.W.2d 251, 255 (S.D. 1980) (reviewing the trial court's order and finding, in part, that "the trial court erred in its ruling on the law" but that the error was harmless).

¶20   But *Bennion* also cited cases that either reviewed directly the administrative body's order or used language that could be interpreted as a mandate to ignore what happened in the district court. *See Urban Council on Mobility v. Minn. Dep't of Nat. Res.*, 289 N.W.2d 729, 733 (Minn. 1980) ("[I]f the record, when considered in its entirety, contains substantial evidence supporting the administrative decision, this court must uphold the agency ruling."); *Wyo. State Dep't of Educ. v. Barber*, 649 P.2d 681, 690 (Wyo. 1982) (analyzing the underlying board decision and concluding that "[t]he Board in no way acted unlawfully, illegally, or in violation of appellee's constitutional rights"); *Merrill v. Dep't of Motor Vehicles*, 458 P.2d 33, 38 (Cal. 1969) (in bank) ("[T]he trial and appellate courts occupy identical positions with regard to the administrative record, and the function of the appellate court, like that of the trial court, is to determine whether that record is free from legal error."); *Smith v. O'Keefe*, 293 N.E.2d 142, 143 (Ill. App. Ct. 1973) ("[T]he principal point in this appeal is whether or not the findings of the Board were against the manifest weight of the evidence."); *N. Las Vegas v. Pub. Serv. Comm'n*, 429 P.2d 66, 68 (Nev. 1967) ("The function of this court is the same when reviewing the action of the district court in such a

matter."); *Norway Hill Pres. & Prot. Ass'n v. King Cty. Council*, 552 P.2d 674, 679 (Wash. 1976) (en banc) ("[W]e note that an appellate court, upon appeal from a superior court's application of any particular standard in reviewing an administrative decision, 'applies the same standard directly to the administrative decision.'" (citation omitted)).

¶21 None of the cases considers the costs and benefits of reviewing either the administrative decision or the intermediate court's order. *Bennion* similarly did not spend any energy analyzing whether we should review the administrative decision directly and disregard what happened in the intermediate court. And although we framed the question in terms of what standard we apply in "reviewing the district court's judgment," we then appear to review directly the Board's decision. *See Bennion*, 675 P.2d at 1139, 1144 (finding "no abuse of discretion in the Board's ordering"). But again, what we did seems at odds with what we said. If we truly believed that we were reviewing the administrative decision directly, we should have said as much, rather than adding the qualifying statement that we act "just *as if*" we were reviewing the agency decision directly. *See id.* at 1140 (emphasis added). Nor would we have needed to say that we neither defer nor presume the correctness of the district court decision because that decision would not be before us. And it appears that since *Bennion*, even though we have said that we review the agency decision directly, we have never stopped to consider whether that is an appropriate reading of *Bennion* or articulated why we would do that. Accordingly, we have never thoughtfully considered the proper approach.

¶22 We have, however, recently analyzed whether, when presented with an appeal from the decision of an agency's executive director reviewing the actions of an agency board, we review the underlying board's decision or the director's. *Utah Physicians for a Healthy Env't v. Exec. Dir. of the Utah Dep't of Envtl. Quality*, 2016 UT 49, ¶ 32, 391 P.3d 148. In *Utah Physicians*, the Utah Division of Air Quality (UDAQ) approved changes at a refinery. *Id.* ¶ 1. The petitioners appealed UDAQ's decision to the Executive Director, and the Executive Director issued a final order approving the changes. *Id.* On appeal, we declined to directly review UDAQ's decision and instead reviewed the Executive Director's decision. *Id.* ¶ 2. We recognized that passing over the Executive Director's order to review UDAQ's decision would effectively permit petitioners to circumvent the preservation requirement at the intermediate level.

*Id.* ¶ 32 n.12. Because "Petitioners failed to preserve seven of their arguments at the intermediate level," we held they could not "resurrect those claims now." *Id.*

¶23 We went out of our way in *Utah Physicians* to distinguish that situation from the one presented in this case. We stated that *Bennion* and its progeny were inapplicable there because while *Bennion* presented a case "where the issue of expertise would pit judge against judge, where both are in an equal position to make a determination," the Executive Director had statutorily recognized technical expertise that we must consider. *Id.* We continue to believe it is an important distinction, but not one that requires us to treat the review of other administrative decisions differently from our review of Department of Environmental Quality decisions. Now that we have been squarely presented with the question of how *Bennion* should be read, we see that the advantages of reviewing the district court's order for correctness outweigh the benefits of directly reviewing the administrative body's order without regard to what happened in the intermediate court.

¶24 As we recognized in *Utah Physicians*, disregarding the intermediate court decision undermines the integrity of our appellate process. *See id.* ("[R]egardless of how much deference we extend, any issue still must be preserved at both the fact-finding and intermediate appellate levels."). Moreover, reviewing the lower court's decision allows the appeal of administrative decisions to enjoy the same procedural safeguards as other appeals. Before the district court, the parties have an incentive to preserve, develop, narrow, and refine the arguments they may eventually make to an appellate court—an incentive that would not be as potent if the parties could anticipate getting a second, and entirely fresh, appeal of the administrative decision.

¶25 We face similar considerations when we exercise certiorari review. In *Bennion*, we decided to review the underlying administrative decision "since the lower court's review of the administrative record is not more advantaged than the appellate court's review." 675 P.2d at 1139. Likewise, on certiorari review, we review the same record from the district court as the court of appeals. In certiorari cases, "we review the decision of the court of appeals, not of the trial court." *Platts v. Parents Helping Parents*, 947 P.2d 658, 661 (Utah 1997). We see no reason why the same considerations should not apply to our review of an appeal of a district court's decision on an administrative order.

¶26 Although this conflicts with what we did, but not necessarily with what we said, in *Bennion,* we clarify that in the appeal of an administrative order, we review the intermediate court's decision. We afford no deference to the intermediate court's decision and apply the statutorily defined standard to determine whether the court correctly determined whether the administrative decision was arbitrary, capricious, or illegal.[4] *See* UTAH CODE § 10-9a-801(3) (2016).[5]

## ANALYSIS

¶27 Utah's Municipal Land Use Development and Management Act (MLUDMA) empowers municipalities to zone the territory within their boundaries and to regulate land uses. UTAH CODE § 10-9a-501 (2016). MLUDMA defines "conditional use" as a use that "because of its unique characteristics or potential impact on the municipality, surrounding neighbors, or adjacent land uses, may not be compatible in some areas or may be compatible only if certain conditions are required that mitigate or eliminate the detrimental impacts." *Id.* § 10-9a-103(5). The Act provides that conditional uses "*shall* be approved if reasonable conditions are proposed, or can be imposed, to mitigate the reasonably anticipated detrimental effects of the proposed use in accordance with applicable standards." *Id.* § 10-9a-507(2)(a) (emphasis added). Denial of a conditional use is appropriate when "the reasonably anticipated detrimental effects of a proposed conditional use cannot be substantially mitigated by the proposal or the imposition of reasonable conditions to achieve compliance with applicable standards." *Id.* § 10-9a-507(2)(b). "The court shall[] (i) presume that a decision, ordinance, or regulation . . . is valid; and (ii) determine only whether or not the decision,

---

[4] Although we take this opportunity to clarify the standard, the outcome of this case would be the same if we reviewed the Council's decision directly. In either scenario, we would conclude that the Council did not produce findings sufficient to permit meaningful review.

[5] We cite to the version of the Code in effect at the time of the district court's decision. We note that the legislature amended The Municipal Land Use Development and Management Act in 2017, but neither party contends that any amendment should be material to our decision.

ordinance, or regulation is arbitrary, capricious, or illegal." *Id.* § 10-9a-801(3)(a). "A final decision of a land use authority or an appeal authority is valid if the decision is supported by substantial evidence in the record and is not arbitrary, capricious, or illegal." *Id.* § 10-9a-801(3)(c).

¶28 The McElhaneys' property is located in an R-2 "single-family and two-family residential" zoning district. MOAB, UTAH, MUN. CODE § 17.45. The R-2 zoning ordinance designation is "characterized by smaller lots and somewhat denser residential environment than the R-1 residential zone" but includes "spacious yards and other residential amenities adequate to maintain desirable residential conditions." *Id.* § 17.45.010. In an R-2 zoning area, a bed and breakfast facility may be allowed as a conditional use. *Id.* § 17.09.530(B).

¶29 The Moab Municipal Code contains detailed conditions of approval for conditional use permits. *Id.* § 17.09.530(H). It also sets forth specific conditions for approval for proposed bed and breakfasts. *Id.* § 17.09.531(9). The Commission is required to hold a public hearing on any conditional use permit, and it must "convey its recommendation and express its findings to [the] city council." *Id.* § 17.09.530(F)(3). The Council is required to hold a public hearing before taking any final action on the application. *Id.* § 17.09.530(G)(1). The applicant bears the burden of demonstrating that the criteria have been met, and "failure to meet one or more of the applicable criteria may be cause for denial." *Id.* § 17.09.530(H). Under the Moab Municipal Code, the Council decides whether the applicant has met the criteria. *See id.*

¶30 At the November 2014 Council meeting, the Council found, by a 3-1 vote, that the McElhaneys had not met their burden. The Council made no explicit findings that supported its assertions that the proposed use did not meet the conditions of approval set forth in the Moab Municipal Code. Instead, the councilmembers expressed their concerns as they announced their votes. Councilmember Peterson concluded that the use was inconsistent with the Moab general plan by effectively forcing a commercial business in a residential area. *See id.* § 17.09.530(H)(7). Councilmember Bailey asserted that the proposed bed and breakfast would fail to meet the "minimal impact" requirement for overnight rentals. *See id.* § 17.09.531(9)(A)(1). And Councilmember Ershadi expressed her primary concern in maintaining the "character of the town" and preserving "space" for locals. She concluded, "I think we need to

take a really hard look at our zoning in general to make sure that local spaces are protected as that." No councilmember spoke explicitly to what "reasonably anticipated detrimental effects" motivated his or her vote. *See* UTAH CODE § 10-9a-507(2)(a). Nor did any councilmember address whether the McElhaneys could substantially mitigate the reasonably anticipated detrimental effects. Indeed, no councilmember made any reference, when explaining the vote, to the conditions the planning commission believed would reasonably mitigate the adverse impacts.

¶31    MLUDMA instructs that a city council's adjudicative land use decision should be upheld if it is supported by substantial evidence in the record and is not arbitrary, capricious, or illegal. *Id.* § 10-9a-801(3)(a)(ii); *Id.* § 10-9a-801(3)(c); *Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 10, 70 P.3d 47 ("When a land use decision is made as an exercise of administrative or quasi-judicial powers, . . . we have held that such decisions are not arbitrary and capricious if they are supported by 'substantial evidence.'" (citation omitted)). The problem with the decision before us is that in the absence of explicit findings of fact and conclusions of law, the reasoning behind the Council's decision is an amorphous target. What adverse impacts did the Council believe the proposed bed and breakfast would impose on the neighborhood? Did the Council decide that the McElhaneys could not mitigate the potential adverse impacts? In other words, in the absence of a written and factually supported decision, the McElhaneys, the district court, and now we, are left to try to divine what specifically a party seeking to overturn the Council's ultimate determination would have to show was unsupported by substantial evidence in the record.

¶32    And that raises the question, what does MLUDMA require of a municipal body, like a city council, when it renders a land use decision in an adjudicative capacity? MLUDMA does not explicitly address this question, but it provides implicit guidance. MLUDMA provides that "[t]he land use authority . . . shall transmit to the reviewing court the record of its proceedings, including its minutes, findings, orders, and, if available, a true and correct transcript of its proceedings." UTAH CODE § 10-9a-801(7)(a). A land use authority cannot fulfill the requirement of transmitting its orders and supporting findings to the reviewing court unless such orders and findings exist.

¶33    Moreover, when our legislature references a "substantial evidence" standard, it employs a term of art that has a specialized

meaning in administrative law. *See id.* § 10-9a-801(3)(c). "When the legislature 'borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (citation omitted).

¶34 The United States Supreme Court has recognized that in an administrative context, "[t]he statutory phrase 'substantial evidence' is a 'term of art,'" which includes within its meaning the requirement "that localities must provide reasons" when they make adjudicative determinations. *T-Mobile S., LLC v. City of Roswell*, 135 S.Ct. 808, 815 (2015) (citation omitted). In *T-Mobile*, a city council denied T-Mobile's application to build a cell phone tower on residential property. *Id.* at 812–13. While the locality was not explicitly required by statute to issue findings, the governing statute required that "any decision to deny a request to build a tower 'shall be in writing and supported by substantial evidence contained in a written record.'" *Id.* at 814 (citation omitted). The Court reasoned that when the legislature used the term "substantial evidence," it invoked appellate courts' "recognition that 'the orderly functioning of the process of [substantial-evidence] review requires that the grounds upon which the administrative agency acted be clearly disclosed,' and that 'courts cannot exercise their duty of [substantial-evidence] review unless they are advised of the considerations underlying the action under review.'" *Id.* at 815 (alterations in original) (citation omitted). It concluded "that localities must provide reasons when they deny cell phone tower siting applications" that are "clear enough to enable judicial review." *Id.*

¶35 And although neither we, nor the court of appeals, have availed ourselves of prior opportunities to label substantial-evidence review a term of art, our cases have similarly reasoned that an administrative agency must "make findings of fact and conclusions of law that are adequately detailed so as to permit meaningful appellate review."[6] *LaSal Oil Co. v. Dep't of Envtl. Quality*, 843 P.2d 1045, 1047 (Utah Ct. App. 1992) (citation omitted); *Adams v. Bd. of Review of Indus. Comm'n*, 821 P.2d 1, 4 (Utah Ct. App. 1991); *Hidden*

---

[6] In contrast to the Council's failure to make findings of fact, the Commission generated a five-page document outlining its findings when it recommended approval.

*Valley Coal Co. v. Utah Bd. of Oil, Gas & Mining*, 866 P.2d 564, 568 (Utah Ct. App. 1993) ("[T]he failure of an agency to make adequate findings of fact in material issues renders its findings '*arbitrary and capricious*' unless the evidence is 'clear and uncontroverted and capable of only one conclusion.'") (alteration in original) (citation omitted). Administrative agencies must "make additional findings of fact that resolve issues which are relevant to the legal standards that will govern the [agency]'s decision." *Milne Truck Lines, Inc. v. Pub. Serv. Comm'n*, 720 P.2d 1373, 1380 (Utah 1986).[7]

¶36 We have recognized that without sufficiently detailed findings that "disclose the steps by which" an administrative agency reaches its ultimate factual conclusions, "this Court cannot perform its duty of reviewing the [] order in accordance with established legal principles and of protecting the parties and the public from arbitrary and capricious administrative action." *Id.* at 1378. On appeal, a court can perform its duty only if the council has created "findings revealing the evidence upon which it relies, the law upon which it relies, and its interpretation of the law." *Adams*, 821 P.2d at 8.

¶37 The court of appeals has applied this logic to require land use authorities to issue findings of fact when denying conditional use permits. In *Davis County v. Clearfield City*, the court of appeals agreed with the trial court's conclusion that the Clearfield City Council's denial of a conditional use permit was arbitrary and capricious in part because "the Planning Commission's refusal to furnish written findings, or at least provide the basis for its decision . . . tended to suggest there was no rational basis for the Planning Commission's decision." 756 P.2d 704, 711 (Utah Ct. App. 1988). The court reasoned that "[e]ven if the reasons given . . . by the council might otherwise be legally sufficient, the denial of a permit is arbitrary when the reasons are without sufficient factual basis." *Id.* (citation omitted). Similarly, in *Ralph L. Wadsworth Construction, Inc. v. West Jordan City*, the court of appeals ruled that the city council failed to support the denial of a conditional use permit with substantial evidence. 2000 UT App 49, ¶ 16, 999 P.2d 1240. The court

---

[7] To be sure, this reasoning controls when a municipality acts in an adjudicative capacity. When a municipality legislates, it has no such obligation.

found that while the city council stated that the proposed use might be considered by neighbors to be a nuisance, "the City Council *did not find that appellants' storage would actually constitute a nuisance.*" *Id.* ¶ 18. Furthermore, the court stated that the city council claimed that the use would be "injurious to the goals of the city" but that the city council had not investigated this claim (which was raised by neighboring property owners), nor had it stated why the use would be injurious. *Id.* ¶ 17.

¶38 Other courts have required land use authorities to issue specific findings. The Supreme Court of Iowa concluded a land use authority needed to make written findings even though "[t]here is no statutory requirement that the board do so." *Citizens Against Lewis & Clark (Mowery) Landfill v. Pottawattamie Cty. Bd. of Adjustment*, 277 N.W.2d 921, 925 (Iowa 1979). It reasoned that

> [t]he practical reasons for requiring administrative findings are so powerful that the requirement has been imposed with remarkable uniformity by virtually all federal and state courts, irrespective of a statutory requirement. The reasons have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction.

*Id.* (citation omitted). And a leading treatise has recognized that "[t]he failure to make findings may result in the zoning authority's decision not being upheld, or a remand of the case for preparation of written findings of fact." 8A MCQUILLIN MUN. CORP. § 25:369 (3d ed. 2017) (footnotes omitted).

¶39 Here, the Council concluded that the proposed bed and breakfast use did not meet the criteria set forth in Moab's Municipal Code but prepared no written findings of fact. Various councilmembers rejected the McElhaneys' application on the basis that (1) the proposed use was inconsistent with Moab's general plan and (2) the impact generated by the McElhaneys' proposed use would exceed the "clearly minimal" requirement in the Moab Municipal Code. Under the Moab Municipal Code, these are relevant considerations in assessing the approval of conditional use permits. However, the Council failed to support its conclusions with facts from the record. Further explanation from the Council is needed because without more, it is difficult to see how placing a bed and

breakfast in an area zoned R-2—which specifically permits bed and breakfasts—is inconsistent with Moab's general plan. Similarly, a reviewing court needs to know which impacts the Council believed would be more than "clearly minimal." Furthermore, and perhaps more importantly, since we have no visibility into the Council's thinking on the topic, the Council made no finding at all on whether the McElhaneys' proposals sufficiently "mitigat[ed] the reasonably anticipated detrimental effects of the proposed use." UTAH CODE § 10-9a-507(2)(a).

¶40   The district court noted, and indeed, complained about the absence of findings. In response, Moab, without conceding a problem with its findings, asked the district court to remand to allow the Council to generate explicit findings. The district court did not. Instead, the district court valiantly attempted to fill the void by parsing the comments neighbors made at Council meetings. The district court also examined Google Maps and drew conclusions about the traffic that the bed and breakfast might bring. We commend the district court for its willingness to take on this project, but it was error because the analysis allowed the district court to base its conclusion on what it believed the Council's decision relied upon—increased traffic in the neighborhood. The district court framed the issue this way even though no councilmember explicitly cited traffic as the reason for the decision. The district court may have correctly read the tea leaves; traffic was a concern that many neighbors raised. But it was the Council's responsibility to define the basis for its decision, not the district court's.

¶41  Simply stated, if a city council is going to sit as an adjudicative body, it needs to produce findings of fact capable of review on appeal. By mandating that a reviewing court must uphold a city council's decision as long as it is supported by substantial evidence, the legislature has utilized a term of art that presupposes written findings. And as we have noted in the review of other agency decisions, adequately detailed "findings of fact and conclusions of law . . . permit meaningful appellate review." *LaSal Oil Co.*, 843 P.2d at 1047 (citation omitted). The Council must make additional findings of fact that are relevant to the legal standards that will govern its decision before a court can offer meaningful appellate review.

## CONCLUSION

¶42 On an appeal of a district court's review of an administrative decision, we review the district court's decision. The district court correctly concluded that the Council failed to issue findings sufficient to support its denial of the McElhaneys' application for conditional use permit. But the district court erred in overturning the Council's decision without remanding to permit the Council to craft findings of fact and conclusions of law capable of appellate review. We vacate the district court's order and remand for further proceedings consistent with this opinion.

––––––––––––